## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRIC OF MASSACHSUETTES

| | | |
|---|---|---|
| LIBERTY MUTUAL FIRE INSURANCE | : | |
| COMPANY, as subrogee of Christopher Brown | : | |
| 175 Berkeley Street | : | |
| Boston, MA 02116 | : | |
| | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | NO.: |
| v. | : | |
| | : | **<u>JURY TRIAL</u>** |
| GREE USA, INC. | : | |
| 4195 Chino Hills Parkway #1026 | : | |
| Chino Hills, CA 91709 | : | |
| | : | |
| and | : | |
| | : | |
| MJC AMERICA, LTD. | : | |
| 280 S. Lemon Ave | : | |
| #1507 | : | |
| Walnut, CA 91788 | : | |
| | : | |
| and | : | |
| | : | |
| GREE ELECTRIC APPLIANCES, INC. OF | : | |
| ZHUHAI | : | |
| Jinji Road West | : | |
| Qianshan Zhuhai Guang Dong, 51907 China | : | |
| | : | |
| and | : | |
| | : | |
| HONG KONG GREE ELECTRIC | : | |
| APPLIANCE SALES, LTD. | : | |
| Unit 2612 Miramar Tower | : | |
| 132 Nathan Road | : | |
| Tsin Sha Tsui Kowloon, Hong Kong | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

1.      Plaintiff, Liberty Mutual Fire Insurance Company ("Liberty"), is a corporation organized under the laws of Commonwealth of Massachusetts with its principal place of business located at 175 Berkeley Street, Boston, Massachusetts.

2.      Defendant Gree USA, Inc. ("Gree USA") is a California corporation with its principal place of business located at 4195 Chino Hills Parkway #1026, Chino Hills, California 91709.

3.      Defendant MJC America, Ltd. ("MJC"), is a California corporation with its principal place of business located at 280 S. Lemon Avenue, #1507, Walnut, CA 91788.

4.      Defendant, Gree Electric Appliances, Inc. of Zhuhai ("Gree China") is a Chinese corporation with its principal place of business located at Jinji Road West, Qianshan Zhuhai Guang Dong, 51907 China.

5.      Defendant, Hong Kong Gree Electric Appliances Sales, Ltd. ("Gree Hong Kong"), is a Chinese corporation with its principal place of business located at Unit 2612 Miramar Tower, 132 Nathan Road, Tsin Sha Tsui Kowloon, Hong Kong.

## PERSONAL JURISDICTION

6.      This case arises out of the sale and distribution of two million, five hundred thousand (2,500,000) dehumidifiers that were designed and manufactured by Gree Electric Appliances, Inc. of Zhuhai ("Gree China") and exported into the United States by Gree China's wholly owned subsidiary, Hong Kong Gree Electric Appliance Sales, Ltd. ("Gree Hong Kong").

7.      In turn, defendants MJC and Gree USA distributed the dehumidifiers from China to retailers throughout the United States.

8.      Despite its substantial sales of products worldwide, Gree China had relatively small sales in the United States before 2010.

9.     As part of its plan to penetrate the US consumer market, Gree China needed a brand name that major US retailers were familiar and comfortable with, so that these retailers would purchase products manufactured by Gree China.

10.     Starting in 2008/2009, Gree China, for the purpose of increasing sales in the United States and for the purpose of associating itself with a brand familiar to US retailers, approached MJC in California about MJC selling and promoting Gree products to US retailers, including Home Depot, Sears, Lowe's and other similar retail chains.

11.     Starting in 2010, Gree China and MJC agreed to brand dehumidifiers under the name "SoleusAir powered by Gree" as a test case to determine if MJC's Soleus brand could assist Gree China in penetrating the US market.

12.     From January of 2010 until October of 2010, Gree China exported at least 421,000 dehumidifiers bearing the "SoleusAir powered by Gree" brand to MJC in California for distribution to US retailers, including retailers in Ohio.

13.     In September of 2010, Madam Dong, the President and CEO of Gree China and Gree Hong Kong, along with other employees of Gree China and Gree Hong Kong, traveled to California for the purposes of meeting with MJC's officers and to tour US retailers.

14.     As a result of the September 2010 meeting in California, Gree China and Gree Hong Kong entered into a memorandum of understanding concerning the formation of a joint venture between Gree Hong Kong and MJC, whereby Gree Hong Kong would own 51% and MJC would own 49% of a company to be called Gree USA which would market, sell, and distribute products made by Gree China in the United States.

15.     In 2011, Gree China manufactured 274,691 dehumidifiers that it sold via Gree Hong Kong to MJC and Gree USA, which MJC and Gree USA distributed to retailers throughout the United States, including Ohio.

16.     In 2012, Gree China manufactured 845,513 dehumidifiers that it sold via Gree Hong Kong to MJC and Gree USA, which MJC and Gree USA distributed to retailers throughout the United States, including Ohio.

17.     In 2013, Gree China manufactured 285,596 dehumidifiers that it sold via Gree Hong Kong to MJC and Gree USA, which MJC and Gree USA distributed to retailers throughout the United States, including Ohio.

18.     In total, from 2010 through 2013, Gree China manufactured and sold 1,840,000 dehumidifiers via Gree Hong Kong to MJC and Gree USA, two California corporations, which MJC and Gree USA distributed to retailers throughout the United States, including Ohio.

## SUBJECT MATTER JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as plaintiff is a citizen of a different state than all named defendants and the amount in controversy, is in excess of $75,000.00, exclusive of interest.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 as the events giving rise to plaintiffs' claims occurred in this judicial district.

## THE FIRE

21.     At all times material hereto, Christopher Brown was the owner and resident of a house located at 22 Allen Trial, Groton, Massachusetts.

22.     Before October 10, 2022, Mr. Brown had purchased a Soleus by Gree branded dehumidifier with a model number of SG DEH-70 on-line that has been manufactured and distributed by the defendants.

23.     Before October 10, 2022, defendant MJC shipped the dehumidifier to Mr. Brown at his residence in Groton, MA.

24.     As a result of MJC directly shipping the dehumidifier to Mr. Brown, all defendants had actual knowledge that Mr. Brown purchased the dehumidifier, actual knowledge of the Mr. Brown's residence and the ability to contact Mr. Brown directly once the defendants learned the dehumidifier was defective and posed a substantial fire risk.

25.     On or about October 10, 2022, the Brown dehumidifier failed, causing a fire.

26.     The fire caused smoke, flame and water damage to the real and personal property of the Browns as well as loss of use of said property.

27.     Pursuant to the policy of insurance between Mr. Brown and Liberty, Liberty is subrogated to the extent of its payments to the right of Mr. Brown against the defendants named herein.

### GREE CHINA'S AND GREE HONG KONG'S FALSIFICATION OF UL CERTIFICATION

28.     Gree China and Gree Hong Kong represented to MJC, Gree USA, retailers and the general public that its dehumidifiers were certified by Underwriter's Laboratory ("UL") and that the design and materials used in the manufacturing of its dehumidifiers complied with UL Standard 474 and Standard 94.

29.     As part of the UL certification process, Gree China and Gree Hong Kong made representations to UL that the plastics used in the construction of its dehumidifiers complied with the fire ratings in UL 94.

30.     UL 94 requires that consumer electric products, including dehumidifiers, use plastics that have specific burn and flame rates in order to prevent, reduce and limit the risk of fire hazards.

31.     In its application for UL certification under UL 474, Gree China represented that the materials and plastics used to manufacture and construct its dehumidifiers were compliant with UL 94.

32.    Gree China and Gree Hong Kong made these false and misleading representations knowing that the materials and plastics used to manufacture and construct its dehumidifiers were not compliant with UL 94's burn and flame rate requirements.

33.    Gree China and Gree Hong Kong made these false and misleading representations knowing that UL was unable to independently conduct the burn/flame resistance testing set forth in UL 94, and that UL relied on Gree China's representations in the certification documents stating that Gree China had these tests performed and the dehumidifiers complied with UL 94.

34.    US retailers will not purchase and sell dehumidifiers that are not certified by UL.

35.    US consumers will not and cannot purchase dehumidifiers that are not certified by UL because US retailers will not purchase or sell non-UL listed electric products.

36.    Gree China's and Gree Hong Kong falsification of the UL Certification process was done for the purposes of misleading UL into improperly certifying the dehumidifiers and, in so doing, Gree China and Gree Hong Kong defrauded and misled US retailers and consumers into purchasing its dehumidifiers on the false belief that the dehumidifiers were designed and manufactured in compliance with UL standards.

## GREE CHINA'S KNOWING SALE OF DEHUMIDIFIERS AFTER IT HAD ACTUAL KNOWLEDGE THAT ITS DEHUMIDIFIERS WERE DEFECTIVLY DESIGNED AND MANUFACTURED

37.    From 2008 until the present time, Gree China was an original equipment manufacturer for General Electric branded dehumidifiers.

38.    In late 2010, GE instructed Gree China to make certain design changes and product improvements to GE branded, Gree China manufactured dehumidifiers.

39.    The design changes were mandated by GE due to product failure issues with the dehumidifiers, including overheating issues and fires.

40.    The GE mandated design changes required a) the removal of electrical terminal sleeves that used PVC materials; b) the use of UL 94 V0 rated plastics for structural components of the dehumidifiers, including the fan shroud base, center support and external cabinet; and c) the use of UL 94  flammability rated materials for the terminal cover.

41.    Starting in its January 2011 production run, Gree China made the above requested changes for GE dehumidifiers.

42.    Gree China did not make the GE mandated design changes for dehumidifiers manufactured under other brand names, including the dehumidifiers that it was manufacturing and selling to Gree USA and MJC.

43.    Gree China did not make the GE mandated design changes despite actual knowledge that the design and materials defects identified by GE were causing Gree China's dehumidifiers to fail, overheat, and catch on fire.

44.    Since January of 2011, Gree China manufactured and sold approximately 1,400,000 dehumidifiers to Gree USA and MJC in California that Gree China knew were defective because they did not incorporate the GE mandated design and materials changes.

### GREE CHINA'S FALSIFICATION OF UL CERTIFICATION AND SALE OF A KNOWLINGLY DEFECTIVE AND UNREASONABLY DANGEROUS PRODUCT IS IMPUTED TO GREE USA

45.    As is set forth in detail above, the majority owner of Gree USA is Gree Hong Kong, a wholly owned subsidiary of Gree China.

46.    Gree China's knowledge of the UL fraud and Gree China's knowing sale of its defective and unreasonably dangerous products is imputed to Gree USA because officers and directors of Gree China were and are officers and directors of Gree USA.

47.    The common officers and directors of Gree China and Gree USA knew that the dehumidifiers were not compliant with UL standards as they had approved the GE design

changes and they also approved the continued manufacture and sale of dehumidifiers for other brands without the GE mandated design changes.

**MJC AND GREE USA'S KNOWLEDGE OF THE DEFECTS AND GREE CHINA'S AND GREE HONG KONG'S ATTEMPT TO SUPPRESS AND DELAY REPORTING THE DANGEROUS PRODUCT DEFECTS TO THE CONSUMER PRODUCT SAFETY COMMISSION**

48.    In July of 2012, after receiving an unusually high number of consumer complaints, after having witnessed a YouTube video showing a SoleusAir by Gree dehumidifier in flames, and after being contacted by the United States Consumer Product Safety Commission ("CPSC") to respond to a consumer complaint of a dehumidifier that overheated and emitted smoke, MJC became concerned that the Gree China manufactured dehumidifiers were fire safety hazards.

49.    In response to these concerns, Charlie and Jimmie Loh, the owners of MJC and officers and directors of Gree USA contacted Gree China to express their concerns and to request technical and engineering assistance.

50.    From July of 2012 until September 2012, Gree China and Gree Hong Kong responded to the concerns expressed by the Lohs by stating that the product was not defective and was not causing fires despite Gree China's actual knowledge of the falsified UL certification and the GE mandated design changes.

51.    In September of 2012, employees of Gree China and Gree Hong Kong, at the direction of Madam Dong, traveled to California to meet with the Lohs and other employees of MJC and Gree USA for the purposes of discussing the dehumidifier safety issues.

52.    During the September 2012 meeting, Larry Lam, an employee of Gree Hong Kong, and an engineer known as Ju from Gree China, informed the Lohs that Gree China and Gree Hong Kong were aware that the plastics used in constructing the dehumidifiers were not compliant with UL 94 and UL 474.

53.     In this meeting, Larry Lam and engineer Ju admitted that Gree China knowingly submitted test sample dehumidifiers to UL which did not comply with UL 94 and UL 474 because Gree China knew that UL relied on manufacturers to test their products for UL 94 burn rate compliance and that UL would not conduct independent burn rate testing on Gree China's dehumidifiers.

54.     At the conclusion of the meeting, Gree China, Gree USA, MJC and Gree Hong Kong agreed not to recall their defective products, or to report the defective design and defective materials issues to the CPSC, its retail customers or the general public to avoid adverse publicity and loss of sales.

55.     The decision not to recall their defective products was based on the instructions given from Gree China and Gree Hong Kong to Gree USA and MJC.

56.     As part of this decision, Gree China and Gree Hong Kong wanted to delay any recall until 2013 so that Gree China could continue to capture market share and sales and so that Gree China had time to change its manufacturing lines and supply chains to incorporate the design changes and then to use fire resistant materials.

57.     From September of 2012 until November/December of 2012, Gree USA and MJC continued to receive consumer complaints of overheating and fires caused by their dehumidifiers.

58.     In response to the growing concerns over product safety, Gree USA and MJC placed a temporary hold on sales of dehumidifiers to retailers and warehoused thousands of dehumidifiers.

59.     In December of 2012 or January of 2013, after Gree China and Gree Hong Kong insisted and pressured MJC and its officers and directors, Gree USA, MJC and Gree USA released the temporary hold on sales of dehumidifiers to the retailers.

60.     As part of MJC and Gree USA's agreement with Gree China and Gree Hong Kong to release the temporary hold, Gree China agreed to defend and indemnify MJC for any losses.

61.     Gree China, Gree Hong Kong, Gree USA and MJC continued to sell their defective and unreasonably dangerous dehumidifiers until September of 2013, when the dehumidifiers were recalled pursuant to a voluntary recall program with the CPSC.

### THE RECALL AND CIVIL PENALTY IMPOSED BY THE CPSC

62.     On September 12, 2013, the CPSC announced that Gree China manufactured dehumidifiers were being recalled because of serious fire and burn hazards.

63.     The September 12, 2013 CPSC notice announced that Gree China, Gree Hong Kong, Gree USA and MJC were recalling 2,200,000 dehumidifiers sold from January 2005 through August of 2013 involving the following brand names:  Danby, DeLouhgi, Fedders, Fellini, Frigidaire, Gree, Kenmore, Norpole, Premiere, Seabreeze, SoleusAir, and SuperClima.

64.     In January of 2014, the recall was expanded to include 300,000 GE brand dehumidifiers that had been manufactured by Gree China and sold by Gree China to GE between January of 2008 and December of 2010.

65.     The recall was re-announced on May 15, 2014 due to a significant increase in the number of overheating events and fires caused by the dehumidifiers.

66.     In the months between September of 2013 and May of 2014, the number of overheating dehumidifiers increased from 171 to 471.

67.     In the months between September of 2013 and May of 2014, the number of fires almost tripled from 46 to 121.

68.     As of May of 2015, only 240,000 dehumidifiers have been returned by customers and approximately 2,260,000 remained in US residences.

69.     In response to information provided to the CPSC, the CPSC instituted a civil penalty investigation against Gree China, Gree Hong Kong and Gree USA.

70.     The civil penalty investigation alleged that the defendants a) knowingly failed to report a defect and unreasonable risk of serious injury to the CPSC; b) knowingly made misrepresentations to CPSC staff during its investigation; and c) knowingly sold dehumidifiers bearing the UL safety certification mark knowing that the dehumidifiers did not meet UL flammability standards.

71.     On or about March 14, 2016, Gree China, Gree Hong Kong and Gree USA entered a Settlement Agreement with the CPSC ('CPCS/Gree Settlement Agreement").

72.     Pursuant to the CPSC/Gree Settlement Agreement, Gree China, Gree Hong Kong and Gree USA admitted that they knew that the dehumidifiers were not complaint with the UL flammability standards and sold, offered to sell, distributed in commerce and imported the dehumidifiers bearing the UL registered safety certification mark the despite knowing that said dehumidifiers were not compliant  with UL standards and was not authorized by UL in violation of section 19(a)(12) of the CPSA, 15 U.S.C. § 2068 (a)(12).

73.     On March 25, 2016, the CPSC announced that the defendants had agreed to pay a civil penalty of $15,450,000.00 to settle the charges alleged by the CPSC.

74.     This civil penalty is a record settlement, with the defendants being the first alleged violators of CPSC rules to reach the per violation maximum imposed by the Consumer Product Safety Improvement Act of 2008.

## THE CRIMINAL PROSECUTION AND ADMISSIONS MADE BY GREE CHINA AND GREE HONG KONG

75.     On October 21, 2021, Gree China and Gree Hong Kong entered into a delayed prosecution agreement with the United States with respect to their acts and omissions with regard to their sale and distribution of dehumidifiers.  As part of the resolution of the criminal charges

filed by the United States against Gree China and Gree Hong Kong, agreed that Gree Electric

Appliances, Inc. of Zhuhai ("Gree Zhuhai"), Gree USA, Inc. ("Gree USA"), and Hong Kong

Gree Electric Appliances Sales Co., Ltd. ("Gree Hong Kong") (collectively the "Gree

Companies") hereby agree and stipulate that the following information is true and accurate. The

Gree Companies admit, accept, and acknowledge that they are responsible for the acts of their

officers, directors, employees, and agents as set forth below. The Gree Companies also admit,

accept, and acknowledge that, had this matter proceeded to trial, the government would have

proven beyond a reasonable doubt, by admissible evidence, the facts set forth below:

### The Gree Companies

a)      From 2007 to September 2013, Gree Zhuhai was a large Chinese company

that manufactured household appliances ("Gree appliances") for sale in

and outside of China, including in the United States.

b)      From 2007 to September 2013, Gree Hong Kong was a Chinese subsidiary

of Gree Zhuhai that exported Gree appliances to the United States.

c)      From 2010 to September 2013, Gree USA was a California corporation

with offices in City of Industry, California, and a subsidiary of Gree Hong

Kong. Gree USA sold Gree appliances to retailers in the United States.

Those Gree appliances were manufactured by Gree Zhuhai and imported

into the United States by Gree Hong Kong and Gree USA. Gree USA was

a joint venture between Gree Hong Kong and another company, MJC

America Holdings Co., Inc. ("MJC America Holdings"). Gree Hong Kong

was the majority owner of Gree USA. Gree USA's Chief Executive

Officer ("CEO"), Chief Financial Officer ("CFO"), who was the brother of

Gree USA's CEO, and Chief Administrative Officer ("CAO") were
owners of MJC America Holdings. Gree USA's CEO, CFO and CAO
effectively controlled Gree USA.

d)      From 2010 to September 2013, Gree USA sold in the United States
dehumidifiers manufactured by Gree Zhuhai and imported into the United
States by Gree Hong Kong ("Gree dehumidifiers").

**The Consumer Product Safety Commission and The Consumer Product Safety Act**

e)      The Consumer Product Safety Act (the "CPSA") was enacted to protect
the public from dangerous consumer products.

f)      The United States Consumer Product Safety Commission (the "CPSC") is
the federal agency responsible for protecting consumers from dangerous
consumer products and is the lead federal agency responsible for the
implementation, enforcement, and administration of the CPSA. The CPSC
can order mandatory recalls of dangerous products.

g)      The CPSA requires companies that manufacture, import, distribute, or sell
consumer products to inform the CPSC, among other things, about any
consumer product about which information reasonably supports the
conclusion that such product contains a defect that could create a
substantial product hazard, or creates an unreasonable risk of serious
injury or death. This duty to report also applies to the individual directors,
officers, and agents of those companies. A company's or an individual's

knowing and willful failure to report an unsafe product to the CPSC is
punishable as a felony violation of the CPSA.

**The Gree Companies Learn that Their Dehumidifiers Are Catching Fire**

h)       On or about July 26, 2012, the CEO of Gree USA saw a video of a
burning Gree dehumidifier. On July 26, 2012, Gree USA's CEO sent the
video to a Gree Hong Kong manager ("Gree Hong Kong Manager #1"),
who was also a director of Gree Hong Kong and in charge of exporting
Gree appliances for sale in the United States, copying other Gree USA
employees and a Gree Zhuhai employee. In sending the video, Gree
USA's CEO labeled the email "urgent," and said that the video was
"scarey [sic] to just watch" and a "very serious issue with GREE product
quality." Gree USA's CEO also stated that the video was the third
reported instance of a Gree appliance catching fire since in or about June
2012 and that it could lead to lawsuits against Gree USA as well as a
recall costing millions of dollars. Gree USA's CEO knew that the Gree
Companies had an obligation to inform the CPSC immediately of any
consumer product that contained a defect creating a substantial product
hazard or that created an unreasonable risk of serious injury or death.

i)        Gree Hong Kong Manager #1, replied to the July 26, 2012 email from
Gree USA's CEO that same day. In his reply email, Gree Hong Kong
Manager #1 said that "[w]e also felt shock when we watched the video[,]"
and that he had sent the video to Gree Zhuhai's Quality Department and to

Gree Zhuhai's chief engineer who was also its senior vice president for research and development.

## The Gree Companies Learn That Two Defects in Their Dehumidifiers Are Causing Them to Catch Fire

j)     During August 2012, Gree USA and Gree Zhuhai employees, engineers and officers investigated the Gree dehumidifiers for potential defects that could cause them to catch fire. No employee of Gree USA or Gree Zhuhai informed the CPSC of a defect or risk associated with the Gree dehumidifiers in August 2012.

k)     On September 4, 2012, Gree USA's CEO emailed Gree Hong Kong Manager #1 about the Gree dehumidifiers. The CEO stated that Gree USA had tested its dehumidifier inventory in Gree USA's warehouse and the testing showed that these dehumidifiers burned. The CEO stated "the result is not like what you have told us" regarding how many units were involved because "the result shows the units all can catch the fire and apparently the material is not according to UL standard! I don't think the factory is telling us the fact and truth. . . ." The CEO stated that, because of Gree USA's test results, he would have the dehumidifiers further tested for compliance with UL (formerly Underwriters Laboratory) standards and was planning to inform the CPSC about the Gree dehumidifiers.

l)     On September 5, 2012, Gree Hong Kong Manager #1 emailed Gree USA's CEO instructing "Gree USA to resolve the claim and CPSC case" and stating that Gree Zhuhai would "fully indemnify Gree USA for any

expense and responsibility." That same day, Gree USA's CEO replied and requested more details regarding who would pay the costs that could result from the Gree dehumidifiers and when they would pay, and offered to handle reporting the Gree dehumidifiers to the CPSC if Gree Zhuhai would agree to pay all future costs related to the dehumidifiers' defects. Gree Hong Kong Manager #1 replied on September 6, 2012, stating that they were willing to agree to compensate expenses in a timely manner and that Gree USA "would be the single entity to reply insurance company and CPSC, [and] we will provide the necessary supports of test records and technical information if you need any." After these communications, no one from the Gree Companies informed the CPSC about the Gree dehumidifiers or their defects.

m)    On September 10, 2012, Gree USA's CEO emailed the highest-ranking person at Gree Zhuhai, the chairperson of Gree Zhuhai's board who also served as Gree Zhuhai's President and CEO, copying no one else from Gree Zhuhai or Gree Hong Kong. In this email, Gree USA's CEO stated that "GREE headquarters" had told him not to report the Gree dehumidifiers to the CPSC. Specifically, the Gree USA CEO stated that "GREE headquarters" had told him not to report that the Gree dehumidifiers may be defective and catch on fire and that they might have overheating parts and plastic parts that could burn because the plastic did not meet the UL standard for fire resistance. Gree USA's CEO warned in his email that any company or individual who withheld from the CPSC

16

information about a dangerous product could face severe punishment, including criminal prosecution. Gree USA's CEO asked how Gree Zhuhai would pay future costs related to the Gree dehumidifiers, including any potential harm to MJC America Ltd. ("MJC America"), a company owned by Gree USA's CEO, CFO and CAO which also sold the defective Gree dehumidifiers. Gree USA's CEO stated that if Gree Zhuhai did not give him clear instructions on how to handle the Gree dehumidifiers within a matter of days, then he would inform the CPSC about the dehumidifiers. No one replied to this email.

n)    On September 13, 2012, Gree USA's CEO sent another email to Gree Hong Kong Manager #1. In this email, Gree USA's CEO discussed how a recall of the defective Gree dehumidifiers might be handled and attached the CPSC's "Recall Handbook." Gree USA's CEO also discussed the financial costs and lost sales that could result from a recall. He did not express any consideration or concern about how defective Gree dehumidifiers could harm consumers. Gree USA's CEO asked Gree Hong Kong Manager #1 to forward this email to Gree Zhuhai's chief engineer.

o)    On September 19, 2012, Gree Hong Kong Manager #1 came to Gree USA's offices in City of Industry, California, to meet with Gree USA's CEO. A Gree Zhuhai engineer and three other Gree USA officers also participated in the meeting. This meeting was audio recorded by agreement.

p)      At this September 19 meeting, Gree Hong Kong Manager #1 stated that

Gree Zhuhai's testing of the Gree dehumidifiers was not able to reproduce

the reported fire, but had revealed two defects: (1) the dehumidifiers used

plastics that did not meet UL standards for fire resistance; and (2)

electrical arcing caused by the dehumidifiers' compressors overheating

could burn the non-UL standard plastic used in these dehumidifiers. The

Gree Zhuhai engineer at the meeting also discussed these defects. Gree

Hong Kong Manager #1 stated that he was aware of at least five consumer

reports of Gree dehumidifiers overheating and catching fire but that Gree

Zhuhai "still believe[d] that the fire case is a relatively isolated case . . .

associated with atrocious conditions." He also stated that Gree Zhuhai

would modify the manufacture of all future dehumidifiers to fix this

problem so they would not catch fire.

**The Gree Companies Decide to Delay Reporting and Recalling Their Defective
Dehumidifiers**

q)      At this same September 19 meeting, Gree Hong Kong Manager #1 said

that the meeting participants' decisions on what to do about the Gree

dehumidifiers should be guided by the principle of minimizing the costs

and loss of reputation to the Gree Companies. Gree Hong Kong Manager

#1 said that Gree Zhuhai wanted to delay any recall of the dehumidifiers

for 6 to 9 months because delaying a recall would reduce the recall's

effect on Gree dehumidifier sales. Gree Hong Kong Manager #1 stated

that an immediate recall would have a significant, and negative, effect on

2012 and 2013 Gree dehumidifier sales. Gree Hong Kong Manager #1

stated that a recall could be delayed 6 to 9 months because cooler fall and winter temperatures would help prevent Gree dehumidifiers from overheating and catching fire, and that there should be very few, if any, dehumidifier fires in the 6 to 9 months following September 2012.

r)    In response to what Gree Hong Kong Manager #1 said, Gree USA's CEO said at the meeting that the Gree dehumidifiers' defects were very significant and had important legal implications. But the Gree USA CEO did not push to inform the CPSC of the dehumidifiers. Rather, Gree USA's CEO recommended only that the Gree Companies have another company test the Gree dehumidifiers and then decide whether to delay the recall. Gree Hong Kong Manager #1 responded by urging the Gree USA officers not to conduct such a test of the Gree dehumidifiers because that test would show that the dehumidifiers used plastic that did not meet UL standards for fire resistance. Gree USA's CEO said that the Gree USA officers understood what Gree Zhuhai was asking them to do and needed time to think before making a decision about how to proceed.

s)    Two days after the September 19, 2012 meeting, Gree USA's CEO sent an email to Gree Zhuhai's chief engineer and copied the email to Gree Zhuhai's board chairperson. In his September 21, 2012 email, Gree USA's CEO said that he understood that Gree Zhuhai wanted to delay a recall of the Gree dehumidifiers for 6 to 9 months. Gree USA's CEO also said that he thought that the Gree dehumidifiers were still likely to catch fire, and

that, after careful consideration, Gree USA's officers had decided to report the Gree dehumidifiers to the United States government.

t)    The next day, Gree Zhuhai's chief engineer replied to the September 21, 2012 email from Gree USA's CEO without copying Gree Zhuhai's board chairperson. In his September 22, 2012 email, Gree Zhuhai's chief engineer said that Gree Zhuhai had clearly expressed its opinion about how to handle the defective Gree dehumidifiers, and that he hoped Gree USA's CEO would follow that opinion. Gree Zhuhai's chief engineer said that he had no authority to approve what Gree USA's CEO proposed in his September 21, 2012 email and that he hoped Gree USA's CEO would report his decision on how to handle the defective Gree dehumidifiers to Gree Zhuhai's board chairperson and listen to her opinion.

u)    On September 28, 2012, Gree USA's CEO sent an email to Gree Zhuhai's board chairperson, copying no one else from Gree Zhuhai or Gree Hong Kong. In his email, Gree USA's CEO stated again that Gree's dehumidifiers had two known defects: (1) the compressors in the dehumidifiers could overheat; and (2) the plastic in the dehumidifiers did not meet UL standards for fire resistance, meaning that the plastic would burn when overheated. Gree USA's CEO said that it was known that these two defects could cause the dehumidifiers to catch fire and that there were numerous consumer complaints about the dehumidifiers in fact catching fire. Gree USA's CEO also said that the Gree Companies had sold millions of these defective dehumidifiers. Gree USA's CEO further related

that he believed the Gree Companies should recall the dehumidifiers and warn consumers that using them could result in personal injuries and property damage, but that Gree Zhuhai had not agreed to a recall. Gree USA's CEO warned that a recall could cost hundreds of millions of dollars, would harm the reputation of Gree products, and would reduce the Gree Companies' market share. But Gree USA's CEO also warned that if Gree Zhuhai did not reach an agreement with Gree USA on the recall of the dehumidifiers, then Gree USA unilaterally would report the Gree dehumidifiers to the United States government. Gree USA's CEO concluded his email by saying that this was a very important and urgent matter. Neither Gree Zhuhai's board chairperson nor anyone else at Gree Zhuhai replied to this email.

v)     Despite the Gree USA's CEO's September 4, 10, 21, and 28, 2012 emails, no employee of the Gree Companies reported the Gree dehumidifiers' defects or risks, or the known consumer complaints of fires related to the dehumidifiers, to the CPSC in September 2012.

w)     In September 2012, Gree USA sold at least 24,999 defective Gree dehumidifiers to retailers in the United States for approximately $2,558,019. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these

Gree dehumidifiers met all UL standards were false when these

dehumidifiers were sold.

### The Gree Companies Continue to Sell Their Defective Dehumidifiers in The United States Without Reporting Them to the CPSC

x)    On October 19, 2012, a sales representative for Gree USA met in person

with Gree Zhuhai's board chairperson in China. During this meeting, the

sales representative discussed the defective Gree dehumidifiers with Gree

Zhuhai's board chairperson. Gree Zhuhai's board chairperson said that she

would send a new Gree Hong Kong manager ("Gree Hong Kong Manager

#2") to the United States to address the problems associated with the

dehumidifiers.

y)    In October 2012, Gree USA sent to Gree Zhuhai new consumer reports of

fires related to the Gree dehumidifiers. These reports contradicted Gree

Hong Kong Manager #1's statements at the September 19 meeting that a

recall could be delayed 6 to 9 months because cooler fall and winter

temperatures would help prevent dehumidifiers from overheating and

catching fire and that there should be very few, if any, dehumidifier fires

in the 6 to 9 months following September 2012. Despite these new

consumer reports of fires caused by Gree dehumidifiers, no employee of

the Gree Companies informed the CPSC about the dehumidifiers' defects

or risks in October 2012.

z)    In October 2012, Gree USA sold at least 2,938 defective Gree

dehumidifiers to retailers in the United States for approximately $429,426.

The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

**The Gree Companies Receive Another Test Report Showing That Their Dehumidifiers Are Defective and Dangerous**

aa)    In late October 2012, Gree USA sent two Gree dehumidifiers to an independent testing company for testing. On November 5, 2012, the testing company wrote a report confirming and reiterating that the Gree dehumidifiers were defective because the compressors in the dehumidifiers could run continuously and thereby overheat to an "extreme high temperature." Gree USA's CEO received this report on November 6, 2012. Gree USA's CEO immediately sent the report to Gree Hong Kong Manager #2, who had taken over responsibility for the importation and sale of the Gree dehumidifiers in the United States from Gree Hong Kong Manager #1.

**The Gree Companies Continue to Sell Their Defective Dehumidifiers in The United States Without Reporting Them to the CPSC**

bb)    At the end of November 2012, Gree USA's CEO told Gree Hong Kong Manager #2 that an attorney advised him to inform the CPSC immediately of all consumer reports of fires related to the Gree dehumidifiers. Despite this legal advice and the November 5, 2012 test report reiterating that the

Gree dehumidifiers were dangerously defective, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in November 2012.

cc)     In November 2012, Gree USA sold at least 6,817 defective Gree dehumidifiers to retailers in the United States for approximately $792,067. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

**The Gree Companies Have Yet Another Meeting to Discuss Their Defective Dehumidifiers but Still Do Not Inform The CPSC**

dd)     On December 18, 2012, Gree USA's CEO and another Gree USA officer went with an attorney to Hong Kong to meet with Gree Hong Kong Manager #2, a Gree Zhuhai engineer, Gree Zhuhai's Chief Financial Officer ("CFO") and three attorneys representing Gree Zhuhai. At this meeting, Gree USA's CEO discussed the November 5, 2012 test report with Gree Hong Kong Manager #2, the Gree Zhuhai engineer and the Gree Zhuhai CFO. Gree Hong Kong Manager #2, the Gree Zhuhai engineer and the Gree Zhuhai CFO told Gree USA's CEO that Gree Zhuhai would test the Gree dehumidifiers and let him know the results of their testing.

ee)    No employee of the Gree Companies informed the CPSC about the

dehumidifiers' defects, risks, or reported fires in December 2012.

ff)    In December 2012, Gree USA sold at least 1,395 defective Gree

dehumidifiers to retailers in the United States for approximately $201,835.

The Gree Companies knew that the retailers wanted dehumidifiers that

met all UL standards and did not burn when overheated. The Gree

Companies knew that Gree USA represented to its retailers that the Gree

dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO

knew that Gree USA's representations that these Gree dehumidifiers met

all UL standards were false when these dehumidifiers were sold.

**The Gree Companies Decide to Keep Selling Their Defective Dehumidifiers in The United States Without Reporting Them to the CPSC**

gg)    On January 23, 2013, a Gree USA officer sent an email to Gree Hong

Kong Manager #2. The email stated that Gree USA's and MJC America's

insurance company suggested that Gree USA report the Gree

dehumidifiers to the CPSC and recall all of the defective Gree

dehumidifiers. The email also stated that the insurance company "wanted

to know if any actions were taken to test the product design in case it is

defective" and was told that "the product was submitted to several

different testing and no faulty [sic] in the design was found[,] also that

new production has an extra protection[.]" The Gree USA officer further

reported in her email that Gree USA had received a new consumer report

of a dehumidifier fire and asked how Gree USA should handle this report.

hh)    Also on January 23, 2013, Gree Zhuhai told Gree USA in writing that it had tested its dehumidifiers and that they were not defective and could be sold in the United States. Gree Zhuhai did not provide Gree USA with any details on its testing or explain the inconsistency in its test results with those of all prior tests of the Gree dehumidifiers.

ii)    Despite the recommendation of Gree USA's insurance company to report the Gree dehumidifiers to the CPSC and recall the defective Gree dehumidifiers, and the new consumer report of fire, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in January or February 2013.

jj)    Gree USA sold at least 7,609 and 29,857 defective Gree dehumidifiers in January and February 2013, respectively, to retailers in the United States for approximately $905,291, and $3,255,542, respectively. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

**The Gree Companies Finally Report Their Defective Dehumidifiers to The CPSC But Continue to Sell Those Dehumidifiers in The United States**

kk)    On March 14, 2013, Gree USA, Gree Zhuhai, and MJC America made an initial report to the CPSC about their dehumidifiers. The initial report

stated that they had sold approximately 1.6 million Gree dehumidifiers in the United States since 2010, and that consumers who had purchased those dehumidifiers had reported fires, overheating, smoke, odors, and property damage related to these dehumidifiers. The initial report did not mention the defects in the Gree dehumidifiers that caused the dehumidifiers to burn.

ll)    Gree USA sold at least 6,025 and 7,596 defective Gree dehumidifiers in March and April 2013, respectively, to retailers in the United States for approximately $571,702 and $799,244, respectively. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

mm)   On April 23, 2013, the Chief Administrative Officer of Gree USA received an independent test report showing that the plastic used in four Gree dehumidifiers made in 2010, 2011, and 2012 did not meet UL standards for fire resistance.

nn)    On April 30, 2013, Gree USA, Gree Zhuhai, and MJC America made a second, more comprehensive report to the CPSC about their defective Gree dehumidifiers. This report stated that Gree USA, Gree Zhuhai, and

MJC America sold approximately 1.84 million of the Gree dehumidifiers and that they had not concluded that these Gree dehumidifiers posed a substantial product hazard or that the dehumidifiers needed to be recalled. This report listed nineteen known consumer reports of fires involving Gree dehumidifiers with all but one of the fires occurring between June 14, 2012 and April 15, 2013.

oo)　After their April 30, 2013 report to the CPSC, the Gree Companies continued to receive consumer reports of fires caused by Gree dehumidifiers.

pp)　The Gree Companies received at least $9,500,000 from the distribution and wholesale of defective Gree dehumidifiers from September 2012 through April 2013. Additionally, the Gree Companies received at least $29,500,000 from the distribution and wholesale of other non-defective Gree dehumidifiers from September 2012 through April 2013.

qq)　United States consumers lost at least $17,400,000 by purchasing defective and dangerous Gree dehumidifiers manufactured, distributed, or sold by the Gree Companies from September 2012 through April 2013.

rr)　From September 2012 to April 2013, United States consumers sustained at least $2,100,000 worth of property damaged or destroyed in fires caused by the defective Gree dehumidifiers.

**The Gree Companies Imported Their Defective Dehumidifiers with False Ul Certifications**

ss)     Between 2010 and at least until September 2012, the Gree Companies

imported into the United States Gree dehumidifiers with certifications that

the dehumidifiers met all UL standards, when in fact the dehumidifiers did

not meet UL standards.

**The Gree Companies Finally Recall Their Defective Dehumidifiers**

tt)     By mid-July 2013, Gree Zhuhai decided to recall its defective Gree

dehumidifiers and notified the CPSC of this decision. After making this

decision, Gree Zhuhai started to plan for the recall.

uu)     On September 12, 2013, Gree Zhuhai and the CPSC announced a

voluntary recall of 2.2 million Gree dehumidifiers in the United States.

vv)     Despite its recall, Gree Zhuhai has received hundreds of consumer reports

of fires and overheating caused by defective Gree dehumidifiers.

Consumers have reported more than 2,000 incidents involving Gree

dehumidifiers, including 450 fires and more than $19,000,000 in property

damage.

ww)     No later than September 19, 2012, each of the Gree Companies had

information which reasonably supported the conclusion that their Gree

dehumidifiers: (1) contained defects which created a substantial product

hazard, that is, a substantial risk of injury to the public; and (2) created an

unreasonable risk of serious injury or death. After learning this

information, each of the Gree Companies knowingly and willfully failed

immediately to inform the United States Consumer Product Safety
Commission about these dangerous defects in their Gree dehumidifiers or
the dangerous risks posed by their Gree dehumidifiers.

## COUNT I:  PRODUCT LIABILITY CLAIM

76.    Plaintiff incorporates by reference the foregoing paragraphs as though fully set
forth herein.

77.    The defendants are the manufacturers and sellers of the Brown dehumidifier.

78.    Defendants as the manufacturers and sellers of the Brown dehumidifier are
strictly liable for breach of warranty in tort to plaintiff for the fire and resulting damages because
they jointly designed, manufactured, packaged, distributed and sold dehumidifier in a defective
condition in in the following ways:

    (a)    Improperly designing dehumidifier and the thermal overload protector;

    (b)    Using non-fire retardant plastics in the construction of the dehumidifier;

    (c)    Selling a dehumidifier that the defendants knew was prone to overload
        protector failures;

    (d)    Failing to use the correct materials in the design of the thermal overload
        protector and associated wiring;

    (e)    Improperly designing the compressor and refrigeration system so as to
        cause excessive heating;

    (f)    Intentionally using plastics that lacked fire retardants in violation the
        applicable UL standards;

(g)    Failing to promptly stop the sale and distribution of the dehumidifier after the defendants knew that it would cause a fire under normal and expected use.

79.    The foregoing defects in the Brown dehumidifier caused the Brown dehumidifier to be sold to the Browns in a defective and unreasonably dangerous condition at the time it was manufactured, sold and distributed by the defendants rendering the Brown dehumidifier unreasonably dangerous and unfit for use as a portable dehumidifier, which is the ordinary use for which it was sold.

80.    The Brown dehumidifier was used in the way it was intended or otherwise was used in a reasonably foreseeable manner as a portable dehumidifier.

81.    As a result of the defendants' manufacture, distribution and sale of the Brown dehumidifier in the foregoing defective and unreasonably dangerous condition, the Brown dehumidifier caught on fire causing fire, smoke and water damage to the real and personal property of the Browns and caused loss use thereof.

WHEREFORE, Plaintiff demands judgment in its favor against the defendants in an amount in excess of the jurisdictional limits of this Court, exclusive of interest and costs.

## COUNT II:  NEGLIGENCE

82.    Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

83.    The defendants are the manufacturers and sellers of the Brown dehumidifier.

84.    Defendants as the manufacturers and sellers of the Brown dehumidifier had a duty to properly design, manufacture, package, distribute and sell the Brown dehumidifier.

85.     The below negligence acts and omission of the defendants caused the fire and resulting damages:

(a)     Improperly designing dehumidifier and the thermal overload protector;

(b)     Using non-fire retardant plastics in the construction of the dehumidifier;

(c)     Selling a dehumidifier that the defendants knew was prone to overload protector failures;

(d)     Failing to use the correct materials in the design of the thermal overload protector and associated wiring;

(e)     Improperly designing the compressor and refrigeration system so as to cause excessive heating;

(f)     Intentionally using plastics that lacked fire retardants in violation the applicable UL standards;

(g)     Failing to promptly stop the sale and distribution of the dehumidifier after the defendants knew that it would cause a fire under normal and expected use.

(h)     Failing to property inform the Browns of the defective and unreasonably dangerous condition of the dehumidifier after the defendants learned that the dehumidifier was unreasonably dangerous and a fire hazard when the defendant, by reason of their direct shipment of the dehumidifier to the Browns had actual knowledge that the Browns and the property of the Browns were at risk of significant injury;

(i)     Failing to property recall the Brown dehumidifier by personally informing the Browns of the recall and defective and unreasonably dangerous condition of the dehumidifier after the defendants learned that the dehumidifier was unreasonably dangerous and a fire hazard when the defendant, by reason of their direct shipment the dehumidifier to the Browns. had actual knowledge that the Browns and the property of the Browns were at risk of significant injury.

86.     The foregoing negligent act and omissions of the defendants caused the Brown dehumidifier to sold to the Browns be in a defective and unreasonably dangerous condition at the time it was manufactured, sold and distributed by the defendants rendering the Brown dehumidifier unreasonably dangerous and unfit for use as a portable dehumidifier, which is the ordinary use for which it was sold.

87.     The Brown dehumidifier was used in the way it was intended or otherwise was used in a reasonably foreseeable manner as a portable dehumidifier.

88.     As a direct and proximate result of the defendants' manufacture, distribution and sale of the Brown dehumidifier in the foregoing defective and unreasonably dangerous condition, the Brown dehumidifier caught on fire causing fire, smoke and water damage to the real and personal property of the Browns and caused loss use thereof.

89.     As a direct and proximate result of the defendants' failure to provide a post-warning and recall notice to the Browns, the Browns continued to use the dehumidifier after the defendants had actual knowledge of the defective and unreasonably dangerous condition of the

dehumidifier and had the defendants provided a post-sale warning, the Browns would have stopped using the dehumidifier and the fire, smoke and water damage to the Browns real and personal property would not have occurred.

WHEREFORE, Plaintiff demands judgment in its favor against the defendants in an amount in excess of the jurisdictional limits of this Court, exclusive of interest and costs.

DATED: June 11, 2024                Respectfully Submitted,

                                    Plaintiff

                                    LIBERTY MUTUAL FIRE INSURANCE
                                    COMPANY, as subrogee of Christopher Brown

                                    By Its Attorneys,


                                    _/s/ Stephanie Chesney_
                                    Stephanie Chesney BBO # 672790
                                    Cozen O'Connor
                                    200 State Street, Suite 1105
                                    Boston, MA 02109
                                    (617) 849-5010
                                    schesney@cozen.com